Walter BELL, Jr., Petitioner-Appellant,

v.

James A. LYNAUGH, Director, Texas Department of Corrections, Respondent-Appellee.

No. 87–2696.

United States Court of Appeals, Fifth Circuit.

Sept. 23, 1987.
Certiorari Denied Nov. 2, 1987.
See 108 S.Ct. 310.

Edward M. Chikofsky, New York City, for petitioner-appellant.

Paula C. Offenhauser, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before POLITZ, WILLIAMS, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellant Walter Bell, Jr., a state prisoner sentenced to die for a 1974 murder, appeals the district court's denial of his petition for a writ of habeas corpus, 28 U.S.C. § 2254. We affirm.

### FACTS AND PROCEDURAL HISTORY [1]

Ferd and Irene Chisum were found dead in their Port Arthur home on July 19, 1974.

---

1. Our recitation of the facts and procedural history is brief, as an exhaustive background is

Appellant was arrested the next morning and shortly thereafter confessed to killing the Chisums after officials confronted him with incriminating physical evidence lawfully found at his home. Appellant initiated contact with officials the following day and gave a second confession in which he admitted robbing the Chisums and raping Irene Chisum.

He was tried and convicted of Irene Chisum's murder and was sentenced to death in December 1974. That conviction was affirmed on appeal, *Bell v. State*, 582 S.W.2d 800 (Tex.Crim.App.1979), *cert denied*, 453 U.S. 913, 101 S.Ct. 3145, 69 L.Ed.2d 995 (1981), *reh. denied*, 453 U.S. 927, 102 S.Ct. 889, 69 L.Ed.2d 1022 (1981), but was set aside during habeas review in 1984. Appellant was tried and convicted of Ferd Chisum's murder and was sentenced to death in March 1982. That conviction was affirmed on appeal, *Bell v. State*, 724 S.W.2d 780 (Tex.Crim.App.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). After exhausting all of his state remedies, appellant petitioned for a writ of habeas corpus. The district court denied appellant's petition in a comprehensive and well-reasoned opinion, *Bell v. Lynaugh*, 663 F.Supp. 405 (E.D.Tex.1987). Appellant thereafter filed a timely notice of appeal.

Appellant challenges his detention on numerous grounds that we shall address in order.

## INEFFECTIVE ASSISTANCE OF COUNSEL

▮ Appellant contends that he received ineffective assistance of counsel at the penalty phase of his trial because his attorney failed to present or explore psychiatric evidence of his mental retardation as a mitigating factor.[2] For appellant to succeed on this claim, he must prove that his counsel's representation fell below an

objective standard of reasonableness and that the result of the proceeding would have been different but for his attorney's unprofessional conduct. *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674, 693, 697 (1984); *Lowenfield v. Phelps*, 817 F.2d 285, 289–90 (5th Cir.), *cert. granted in part*, —— U.S. ——, 107 S.Ct. 3227, 97 L.Ed.2d 734 (1987). Our scrutiny of appellant's counsel's performance under this standard is extremely deferential. *Lowenfield*, 817 F.2d at 290 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694). Further, with respect to counsel's duty to investigate, the duty at issue here,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Lowenfield*, 817 F.2d at 290 (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

▮ The federal district court held an evidentiary hearing on May 11, 1987, to address this issue. Appellant's mother, Bessie Mae Brown, and appellant's 1982 trial counsel, Harold T. Laine, Jr., were the only witnesses called. Appellant's mother testified that school officials determined that appellant had an I.Q. of 54 in the second grade and that appellant received a high school diploma marked "Special Edu-

---

presented in *Bell v. State*, 724 S.W.2d 780 (Tex. Crim.App.1986).

**2.** Appellant also argues that Laine acted ineffectively by not introducing evidence to mitigate the state's evidence of disciplinary problems encountered by appellant while in the Marine

Corps and presenting only three lay witnesses at the penalty phase whose testimony was conclusory and only fourteen transcribed pages. Such allegations were not raised in district court and we thus decline to review their merits here.

cation." She stated that appellant had trouble getting admitted into the military because he could not pass the mental test, that appellant finally was accepted into the United States Marine Corps, and that because of his mental difficulties, appellant was "desirably discharged" from the Marine Corps after approximately one year. She testified that she informed Laine of appellant's mental state and his history with the Marine Corps, that she did not suggest to Laine that a psychiatrist or psychologist should be appointed to examine appellant, and that she told Laine that appellant was easily led.

Laine testified that he "reviewed the evidence in the first trial and the testimony, and we were in a unique position as far as we knew what the results were of the first trial; we knew what the results were at the punishment stage, and we knew the testimony." He also stated that he had familiarized himself with the medical testimony and clinical reports offered at the 1974 trial by Doctors John Nottingham, C.J. Ruilman, and Lyle Wharton, that when he inquired about additional psychiatric testimony for presentation at the 1982 trial he was told that only Doctors Nottingham and Brown would be appointed,[3] and that presentation of any psychiatric evidence at the 1982 trial would have harmed appellant's case because "we would have had absolute testimony that he was capable of conforming his actions to the law, and that he knew right and wrong, and that he had choices." In Laine's opinion, medical testimony presented at the 1974 trial "would have shown matters opposed to the position" which appellant was taking at the evidentiary hearing. He expressed concern that Nottingham's testimony would reveal that appellant had a diminished capacity to control his impulses and would be more prone to be a future danger to society, and that Wharton's testimony would indicate that appellant could control his impulses but chose not to. When asked why he did not have appellant re-examined in 1982 to learn if conditions had changed during the eight-

year gap between the two trials, Laine testified that the 1974 electroencephalogram indicated no brain damage, the appellant conversed well with him, that he did not believe that any new test results would be favorable, and that the unfavorable results would be introduced into evidence. Laine admitted that he did not discuss the matter with any psychiatrist, including those who had testified at the 1974 trial.

Transcripts of the 1974 testimony of Doctors Nottingham (penalty phase), Wharton (penalty phase), and Ruilman (guilt phase) were introduced at the evidentiary hearing. Nottingham, a psychiatrist called by the state, had examined appellant in September 1974 and noted that appellant's electroencephalogram results were normal. In his opinion, appellant was competent to stand trial, was borderline retarded, and was responsible for his behavior. He also testified that individuals who are borderline retarded "tend to have a decreased impulse control" and are "more likely to give vent to [their] impulses than someone with a higher intelligence level." Nottingham also indicated that individuals easily led by others are "more likely to engage in violent criminal acts." He admitted, however, that he could not look into a "crystal ball" and offer to the jury any proof of appellant's future behavior. Nottingham asserted that appellant "is cognizant of the difference between right and wrong and able to conform his behavior to the expectations of the law and of society if he chooses[,]" that appellant "has the capacity to obey the law if he desires to do so ... [but because of] his decreased impulse control—he might be more likely than other people to engage in criminal behavior[,]" and that appellant "has the intellectual capacity to separate right from wrong and [is] able to determine the consequences of his acts and the nature of his acts and has the capacity to know that so that he can make those decisions and those distinctions."

Wharton, a psychologist testifying for the defense, said that appellant had an I.Q.

---

**3.** Dr. Brown, a psychologist, never examined Bell but worked closely with Dr. Nottingham on most matters.

of 67 and was technically mentally defective. He also testified that based on appellant's recent "experiences," appellant "would be less inclined to wrongdoing" in the future than in recent months. As did Nottingham, however, Wharton also believed that appellant had the mental capacity not to engage in wrongful conduct if he so desired. Psychiatrist Ruilman, another defense witness, diagnosed appellant as having an I.Q. within three to five points of 67, which placed appellant in the upper range of retardation. Ruilman also observed that appellant's electroencephalogram results were normal.

The district court found reasonable Laine's decision to forego reliance on, or introduction into evidence of, any psychiatric evidence. It found that Laine neither neglected nor ignored the issue of appellant's mental state. Rather, Laine's decision reflected a deliberate trial strategy to avoid possible introduction of unfavorable 1974 testimony through rebuttal as well as to avoid possible proliferation of unfavorable evidence. *Bell*, 663 F.Supp. at 425.[4]

The record clearly indicates that Laine did not fail to consider as mitigating evidence appellant's mental state. Thus the issue is whether Laine's decision not to offer mitigating evidence on appellant's mental state was reasonable. Mindful of the degree of deference due counsel's trial tactics under *Strickland*, we conclude that Laine acted reasonably.

Laine familiarized himself with medical testimony offered by both the defense and the state during the 1974 trial prior to developing his trial strategy.[5] The unique procedural posture provided Laine with the 20/20 hindsight to know that such evidence when presented eight years earlier had had little, if any, effect on the jurors' deliberations. He realized that the testimony of Nottingham and Wharton was particularly damaging and genuinely feared that such evidence was admissible as rebuttal evidence if he placed appellant's mental state in issue.[6] *See Williams v. Lynaugh*, 809 F.2d 1063, 1068–69 (5th Cir.1987). He was also aware that Nottingham or his associate, Dr. Brown, would once again conduct any state inquiry in 1982. Armed with such knowledge, we cannot say that Laine acted outside the realm of professional competence.[7]

Appellant numerous times contends that Laine should have requested a re-evaluation of his mental state in 1982 because his mental state might have improved to such

4. "[A]lthough district court findings are subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a), both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070, 80 L.Ed.2d at 700.

5. Because the doctors' only material disagreement concerned appellant's I.Q., we do not fault Laine for failing to discuss the otherwise nearly uniform testimony with any of the witnesses.

6. Appellant suggests that because the focus during the 1982 trial was on the penalty to be imposed and not on appellant's guilt, Laine was obligated to introduce psychiatric evidence because it was the only possible avenue of relief. We decline to force Laine or any other attorney to travel an avenue which they genuinely fear will lead only to trouble for their client.

7. Appellant's reliance on *Burger v. Kemp*, —— U.S. ——, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), is misplaced. First, the passage quoted by appellant in his Opening Brief at 25 is from the dissenting opinion. Second, and more impor-

tant, the purpose of the quoted passage was to condemn an attorney's reason for not requesting a complete psychological examination of his client: biased examination procedures. —— U.S. at ——, 107 S.Ct. at 3135, 97 L.Ed.2d at 668. The record does not indicate, nor does appellant allege, that Laine failed to request a mental examination in 1982 because he feared that any examination would be conducted in a biased manner.

Nor is our recent decision in *Wilson v. Butler*, 813 F.2d 664 (5th Cir.1987), controlling. In *Wilson* we granted an evidentiary hearing on the issue whether the defendant's counsel acted ineffectively at the penalty phase of trial by failing to present evidence of mental impairment as a mitigating factor. Critical to our decision was our observation that the defendant's attorney did "not assert that he thought about the possibility of an investigation or made a strategic decision, and neither the state's brief nor the district court opinion suggests any factual support for that thesis." *Id.* at 672. Here the record indicates that Laine investigated the issue of appellant's mental condition and made a strategic decision not to present the matter as a mitigating factor.

an extent since 1974 that the 1982 jury might not have found him to be a future danger to society and thus might not have imposed the death penalty. He calls to our attention that from 1974 to 1982 appellant had no record of involvement in any incidents of violent behavior. This, in appellant's opinion, suggests both a lack of future dangerousness and rehabilitation potential.

We do not believe that Laine acted unreasonably by not re-evaluating appellant's mental state in 1982. First, the 1974 electroencephalogram was normal. Second, appellant had spent the eight intervening years on death row—a highly controlled and sheltered environment where appellant was not only unlikely to engage in violent behavior but also where appellant's mental state would more likely worsen rather than improve. Third, the 1982 jury did not know that appellant had been convicted for the murder of Irene Chisum in 1974[8] and had spent eight years on death row. The jury may have become aware of these prejudicial facts if Laine had re-evaluated appellant's mental state in 1982 and had attempted to present appellant as a non-violent individual.

Appellant also contends that because 1974 psychiatric testimony failed to predict future dangerousness, the introduction of such testimony as rebuttal evidence in 1982 would have insignificantly affected jurors' deliberations. We note, however, that Texas courts have held that circumstances of the offense itself are probative of the propensity to commit future violent acts. *See Bell*, 724 S.W.2d at 803, and cases cited therein. Also, although no medical witness could state with certainty that appellant would commit future violent acts, the experts' testimony suggested that appellant was more likely than not to again act violently. We doubt, however, that a jury would have discounted the cautionary language as being anything other than what it was—a concession that even medical experts cannot predict with 100% accuracy how a patient will act in the future.

Based on our review of the record, we conclude that appellant has failed to prove that the equity of his sentence was tainted by a breakdown in the adversary process initiated by Laine's representation. Appellant's ineffectiveness claim must fail.[9]

## ADMISSION OF SECOND CONFESSION

The Texas Court of Criminal Appeals held that appellant's warrantless arrest was improper because no exigent circumstances existed.[10] 724 S.W.2d at 786-87. The court then held that appellant's first confession was inadmissible under the Fourth Amendment's "fruit of the poisonous tree" doctrine. *Id.* at 787-91. The court concluded, however, that appellant's second confession was untainted under the Fourth Amendment and voluntary under the Fifth Amendment. *Id.* at 791-93. Appellant disagrees with this latter holding.

■ We need not spend much time addressing appellant's Fourth Amendment concerns, for appellant does not allege, nor does our independent review of the record indicate, that appellant did not have a full and fair opportunity to litigate his Fourth Amendment claim in state court. Where

8. The 1974 conviction became final in state court in 1981.

9. At the evidentiary hearing the district court took under advisement defense counsel's application for the appointment of a defense psychiatrist under 18 U.S.C. § 3006A(e). The district court denied the request. *Bell*, 663 F.Supp. at 425. Relying on *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), appellant contends that the district court's denial of his request violated his due process rights. *Ake* does not support his position.

10. An individual arrived at the local police station at approximately 12:30 a.m. on July 20, 1974, and told officials that appellant could be found at a bar that closed at 1:00 a.m. The arresting officials did not believe that they needed an arrest warrant because appellant's whereabouts would be unknown within minutes after the bar closed. Relying on the "escape" requirement of warrantless arrests permitted under Tex.Crim.Proc. Code Ann. art. 14.04 (Vernon 1977), the court concluded that appellant's warrantless arrest was unlawful because "there is no evidence that appellant was about to escape or that the officers thought he was about to escape." 724 S.W.2d at 787.

such is the case, "a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067, 1088 (1976) (footnotes omitted); *see also Wicker v. McCotter,* 783 F.2d 487, 497 (5th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986).

■ Appellant contends that his second confession was inadmissible under the Fifth Amendment because he confessed involuntarily. He cites his mental retardation, his deprivation of access to his family, and questionable police conduct as grounds for finding involuntariness. Coercive police activity must be present before a confession given by a mentally ill person is deemed involuntary. *Colorado v. Connelly,* — U.S. —, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The record does not indicate, nor does appellant allege, that police used physical or psychological tactics to extract appellant's second confession. The only police misconduct we find is failure to procure an arrest warrant. This procedural defect falls far short of the type of coercive activity deemed necessary by the United States Supreme Court before a confession will be labeled "involuntary." Furthermore, the record indicates that appellant initiated discussions during which the second confession was offered, that he received a Miranda warning immediately before his second confession, and that appellant gave his second confession after meeting with his mother and step-father. We are convinced that appellant's second confession was the product of a free and rational will and not given involuntarily.

## JURY SELECTION

■ Appellant contends that his right to an impartial jury was violated by the trial judge's exclusion of one prospective juror for cause and failure to exclude two other prospective jurors for cause. Because a determination of juror performance involves evaluation of credibility findings which cannot readily be gleaned from a

cold record, we presume that a trial judge correctly disposed of a litigant's motions to strike for cause. *Wainwright v. Witt,* 469 U.S. 412, 427–30, 105 S.Ct. 844, 854–55, 83 L.Ed.2d 841, 853–56 (1985); *Wicker,* 783 F.2d at 493.

■ Appellant first argues that the trial judge committed reversible error by excusing prospective juror Beatrice Garcia for cause because of her opposition to capital punishment. Bell contends that Garcia's responses during voir dire were inconsistent, ambivalent, and ambiguous and did not contain the degree of unmistakable clarity sufficient to warrant her exclusion from the jury under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Garcia unambiguously stated at least seven times that she could never impose the death penalty under any circumstances. She qualified her answer only when defense counsel asked whether she could impose capital punishment on a killer of a family member. Such is not the case here, and her otherwise articulate, unambiguous, and oft-repeated views on capital punishment easily could have led the trial judge to properly conclude that Garcia's views on capital punishment "would 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" *Wainwright,* 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851 (1985); *see also Griffin v. Lynaugh,* 823 F.2d 856, 864, (5th Cir.1987).

■ Appellant next contends that the trial judge erroneously refused to exclude prospective juror Ouida Branch for cause because her testimony allegedly demonstrated a predisposition to convict appellant if he refused to testify or if he presented no evidence.[11] We have read Branch's testimony, and although we note some ambiguity and confusion in her responses, we do not believe that the trial judge erred in concluding that Branch understood and would apply the correct law pertaining to burden of proof, presumption of innocence, and self-incrimination. Although Branch

---

**11.** Defense counsel ultimately used a peremptory challenge to exclude Branch.

testified that she would require appellant to present evidence before she would find him not guilty, she also testified that she would not hold against appellant the possibility that he might not testify and might not present any evidence. This subsequent clarification, made in response to questions asked by both defense counsel and the prosecutor, suggests that Branch could be a fair and impartial juror and, in our opinion, justifies the trial judge's denial of appellant's motion to strike Branch for cause.

Appellant's final challenge to the jury selection process is that the trial judge erroneously refused to strike prospective juror Helen Head for cause because of her alleged impression that appellant was guilty.[12] Head stated that in 1974 she had read about the murder in a newspaper but could not remember too many facts. When asked whether the newspaper article had influenced her, she stated "I guess he is more guilty, if I have to choose [between guilty and not guilty,]" and "I felt like he was guilty by the paper." She immediately responded negatively, however, when defense counsel asked, "Do you believe that based on what you have heard, or at least the impression that's left of what you have heard, which is natural, that that would, or could, affect some of your deliberations over issues of fact?"

 A person is not automatically rendered unqualified to serve as a juror merely because he has been exposed to media coverage of the charged crime. The issue becomes whether exposure to media publicity will preclude the individual from returning a verdict based solely on the person's application of the law as stated to the evidence presented. *United States v. Wilson*, 732 F.2d 404, 410 (5th Cir.), *cert. denied*, 469 U.S. 1099, 105 S.Ct. 609, 83 L.Ed.2d 718 (1984). In our opinion, Head's negative response to defense counsel's query indicated that she could serve as a fair and impartial juror and justified the trial judge's refusal to grant appellant's motion to strike for cause.

## CHANGE OF VENUE

 Appellant contends that the trial court erroneously denied his motion for change of venue because widespread community prejudice precluded him from receiving a fair trial by an impartial jury. During a pretrial evidentiary hearing the trial judge was presented with conflicting testimony as to the amount of pretrial publicity and its effect on county residents. Defense witnesses Otis Hayward, Lumos Mitchell, and Amos Evans testified that appellant could not receive a fair trial in Jefferson County because pretrial media publicity had influenced the impartiality of area residents. State's witnesses Cecil Holstead, O.B. Goodman, and Albert Reinstra believed that appellant could receive a fair trial because at least twelve fair-minded individuals could be found in a county with a population of approximately 250,000. State's witnesses Goodman, Steve Verret, and Denver Knowles stated that appellant could receive a fair trial because based on their discussions with residents throughout Jefferson County, very few people knew anything about Bell and/or his alleged crimes.

After evaluating all of the testimony, the trial judge reasonably could have concluded that Bell could receive a fair trial in Jefferson County. The opinions of Verret, Goodman, and Knowles were based on views expressed by residents throughout Jefferson County, whereas opinions of Hayward and Evans were based on views expressed only by Port Arthur residents. Furthermore, Hayward and Evans were not disinterested persons. Hayward was related to Bell's mother, and Evans was president of the Port Arthur NAACP. Finally, Mitchell admitted that he could be a fair and impartial juror despite all of the alleged pretrial publicity. We are not persuaded that the trial judge abused his discretion by denying appellant's motion. *U.S. v. Harrelson*, 754 F.2d 1153, 1159 (5th Cir.), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985).

**12.** Defense counsel ultimately used a peremptory challenge to exclude Head.

## PUBLICITY DURING VOIR DIRE

■ After seven jurors had been selected, newspaper articles appeared quoting a federal district judge as saying in regard to appellant's conviction for Irene Chisum's murder, "It appears that the totality of circumstances in this case did not show an injustice was done [by the jury that convicted appellant]. I cannot argue with what the jury did. I think it was well-deserved." Appellant contends that the trial court erroneously refused to permit any inquiry to determine the prejudicial impact of the news articles on the impartiality of the seven jurors.

Although the trial judge denied appellant's motions to voir dire the seven jurors immediately, the trial judge stated that an opportunity to do so would be allowed subsequently upon request. The record does not reflect that appellant ever availed himself of this opportunity, which would have obviated any arguable due process problem, see Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), and appellant does not dispute the allegation.

Bell's contention is thus meritless absent any specific allegation or proof of prejudice or injury. The trial court expressly had warned the seven jurors earlier not to read anything about the case. Also, none of the twenty-five members of the jury panel seated three days after the initial newspaper article was printed had read the article. Thus the trial judge reasonably could have concluded that Bell had suffered no preju-

dice or injury. The trial judge properly denied appellant's motion.[13]

## DENIAL OF SPEEDY TRIAL

Appellant alleges that his constitutional right to a speedy trial was violated because eight years lapsed between his 1974 arrest and his 1982 trial. We will determine the merits of appellant's contention by considering the following four factors: 1) length of delay, 2) reason(s) for delay, 3) appellant's assertion of his right, and 4) prejudice to appellant. See Barker v. Wingo, 407 U.S. 514, 530–32, 92 S.Ct. 2182, 2192–93, 33 L.Ed.2d 101, 116–18 (1972); Millard v. Lynaugh, 810 F.2d 1403, 1406 (5th Cir. 1987).

■ We quickly concede that an eight-year delay, standing alone, is unwarranted and presumptively prejudicial. The record indicates, however, that most of the delay resulted from appellant's desire to postpone trial until after he had exhausted all avenues of appeal from his 1974 conviction for the murder of Irene Chisum. As to the third factor, appellant in his brief fails to discuss when he initially asserted his right. Thus we can only assume that he never objected to the delay until 1982. Appellant does assert, however, that he was prejudiced by the delay. He alleges that the delay prevented him from presenting at his 1982 trial two psychiatric witnesses who had testified at his 1974 trial that appellant was unable to give a knowing, intelligent, and voluntary confession

---

**13.** Our recent decision in *United States v. Williams,* 809 F.2d 1072, 1091–93 (5th Cir.1987), does not require a different result. In *Williams,* the trial judge revoked defendants' bail and returned them to custody of the U.S. Marshal after hearing the testimony of a witness one month into trial. The media extensively covered the story. We held that the trial judge committed reversible error by denying defense counsel's request to individually voir dire the jurors to see if adverse publicity had affected any of them. Our holding was based on the observation that the trial judge placed his official imprimatur on the credibility of a witness' testimony by revoking bail and by placing defendants in custody. Furthermore, we were unsure whether the publicity had reached the jury despite the trial judge's daily admonitions to the jury not to read or listen to external information.

The innate prejudice in *Williams* is absent here because the publicity at issue was not prompted by the presiding trial judge's conduct. Furthermore, because none of the twenty-five members of the jury panel selected after the newspaper article was printed were aware of the article, we can be more confident than in *Williams* that the publicity had not reached the jurors already selected.

We agree that the fact that publicity occurred here during voir dire and not during trial as in *Williams* is a distinction without a difference. The prejudicial effect of publicity on the impartiality of a jury does not fluctuate with the stage of the proceedings during which the publicity occurs.

due to mental retardation.[14] Yet, appellant does not explain why other witnesses could not have offered similar testimony.

Because the record suggests that appellant's tactics prompted most of the delay, that appellant never expressed concern for a speedy trial prior to 1982, and that appellant was not prejudiced by the delay, we find that the eight-year delay did not violate appellant's constitutional right to a speedy trial.

## PROSECUTOR'S SUMMATION

■ Appellant contends that the prosecutor violated his right to a fair trial by committing the following three fatally prejudicial errors during closing argument: 1) appealing to community sentiment, 2) suggesting that appellate courts would review the record and correct any errors, and 3) suggesting that defense counsel had attempted to subvert the truth by making numerous evidentiary objections. The United States Supreme Court has held that a prosecutor's remarks must be more than undesirable or even universally condemnable before reversal is warranted. Instead, the prosecutor's remarks must infect the trial with such unfairness as to make the resulting conviction a denial of due process. *Darden v. Wainwright*, 477 U.S. 187, ——, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144, 157 (1986); *see also Griffin*, at 863. Such was not the case here.

### A. *Community Sentiment*

■ Appellant argues that the prosecutor erroneously suggested to jury members that their verdict should be motivated by community conscience rather than by the evidence. Read in context, the prosecutor's comments make no such suggestion. The prosecutor never urged the jury to ignore the evidence presented, nor did he intimate that the jurors were responsible for carrying out the dictates of the general public. Rather, as both the Texas Court of Criminal Appeals and the federal district court noted, the prosecutor's comments were directed at imploring the jury to return a verdict based on logical consideration of evidence and not on emotion. 724

S.W.2d at 801–02; *Bell*, 663 F.Supp. at 419–20. We find nothing wrong with such comments.

### B. *Appellate Review*

■ Relying on *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), appellant next argues that the prosecutor's reference to appellate review diminished the jury's sense of responsibility sufficient to warrant reversal. Bell's reliance on *Caldwell* is misplaced. Unlike in *Caldwell* where the prosecutor's comment went unchallenged and was in fact reinforced by the trial court, here appellant's attorney objected to the comment, the objection was sustained, and the trial judge admonished the jury to disregard the comment. Although the prosecutor's reference to appellate review was improper, any damage done was minimal and certainly does not warrant reversal.

### C. *Evidentiary Objections*

■ Finally, appellant argues that the prosecutor's references to numerous objections raised by defense counsel improperly created a false impression in the jurors' minds that defense counsel was engaged in some legal chicanery to prevent a fair trial. We note, however, that the prosecutor never personally attacked defense counsel nor referred to specific evidence that should have been admitted. Additionally, the prosecutor conceded that defense counsel had a "right" to object and that both the prosecutor and defense counsel were required to comply with strict evidentiary procedures. Furthermore, the trial judge several times sustained defense counsel's objections and instructed the jury to disregard the prosecutor's comments. Again, although the prosecutor's comments may have been improper, they do not warrant reversal.

### CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of appellant's petition for a writ of habeas corpus.

---

**14.** Dr. Ruilman died between 1974 and 1982 and Dr. Wharton could not be located in 1982.