Alberto VALDEZ, Petitioner,

v.

Gary L. JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

No. CIV A C–98–040.

United States District Court,
S.D. Texas,
Corpus Christi Division.

Sept. 28, 1999.

Jeffrey Scott Levinger, Carrington Coleman, Sloman & Blumenthal, LLP, Dallas, TX, William D. Underwood, Waco, TX, for Petitioner.

Erik E. Cary, Minter Joseph & Thornhill, PC, Austin, TX, Gregory S. Coleman, Austin, TX, for Respondent.

### ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

JACK, District Judge.

On this day came on to be considered Petitioner Alberto Valdez's ("Valdez") petition for writ of habeas corpus filed pursu-

ant to 28 U.S.C. § 2254. For the reasons stated herein, the Court GRANTS Petitioner's writ. The State of Texas (the "State") is hereby ORDERED, within the next 90 days, either to: (1) conduct a new trial on the issue of sentencing, as permitted by Tex.Code Crim.Proc. art. 44.29(c); or (2) vacate Petitioner's sentence and impose a sentence less than death.

## I. JURISDICTION

The Court has jurisdiction over this habeas petition pursuant to 28 U.S.C. § 2254(a).

## II. FACTS AND PROCEEDINGS

In May 1988, a Texas jury found that Valdez had shot and killed a police officer, Joseph D. Bock ("Bock"), with the officer's own gun while attempting to escape arrest. In the sentencing phase of Valdez's trial, the jury answered affirmatively both of the special questions posed to it pursuant to Article 37.071(b) of the Texas Code of Criminal Procedure,[1] thereby subjecting Valdez to the death penalty. In light of these two answers, the trial judge sentenced Valdez to death. Texas appellate courts uniformly denied Valdez's appeals, and the United States Supreme Court denied certiorari.[2] In January 1990, Valdez was appointed new counsel to pursue collateral review of his conviction, and subsequently Valdez filed a state habeas petition. In 1990, the Texas state habeas court held an evidentiary hearing to consider Valdez's petition. Over six years later, in 1997, that Texas court denied his request for habeas relief. Valdez timely filed the instant § 2254 petition in this Court.

Officer Bock's death was both needless and senseless. It was a tragedy of the sort that shatters lives, hardens hearts, and leaves many painful questions unanswered. In all reasonable probability, however, Valdez himself would not be on death row today but for his trial counsels' complete and utter failure to investigate and present available and compelling mitigating evidence to the jury during the sentencing phase of his capital murder trial. Almost everything the jurors learned about Valdez in sentencing was what the State told them: that Valdez had an extensive but non-violent criminal record. The jury was never provided the following available evidence: that this murder was the only violent episode in Valdez's life; that Valdez is mentally retarded; that Valdez was a positive influence on the lives of the people around him despite his childhood of physical and emotional abuse; and that Valdez had an exemplary record of good conduct while in prison and jail.

Clearly, Valdez deserved a punishment of severe magnitude for this heedless crime. Nonetheless, had his trial counsel discovered and presented the mitigating evidence about Valdez, there is a reasonable probability that the jury would not have found that Valdez "would commit criminal acts of violence in the future" and, thus, would not have given him the death sentence. Moreover, withholding this information from the jury was not the result of any informed judgment or strategic decision by trial counsel. As the evidence showed during both the state habeas hearing and this Court's evidentiary hearing, the jury did not learn who Valdez was before deciding whether he should die as trial counsel did not take the time to learn

---

**1.** Article 37.071(b) states:
 "On conclusion of the presentation of the evidence, the court shall submit the following . . . issues to the jury:
 (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."
Tex.Code Crim.Proc. art. 37.071(b).

**2.** Two justices voted to grant certiorari.

who Valdez was. Trial counsel had done no investigation in preparation for the sentencing phase, and thus never bothered to learn about the critical mitigating evidence that any reasonable defense attorney should have and would have uncovered and presented.

For these compelling reasons—and with the utmost sympathy, respect, and concern for all those persons who yet mourn for Joseph Bock—this Court must GRANT Valdez's application for writ of habeas corpus.

### III. FINDINGS OF FACT

Valdez had a turbulent childhood hallmarked by neglect, deprivation, and abuse. At home, Valdez was frequently subjected to wanton beatings by his alcoholic father. (Evid. Hrg. Trans. Vol. I, at 290–91, 322–26.) Valdez was targeted for these beatings more often than his other siblings because he was perceived as "his mother's favorite." (*Id.* at 294.) When Valdez's father was not punishing his son physically, he was devising strange and embarrassing punishments for Valdez and his siblings (such as stripping them of all their clothes for hours), (*id.* at 293), and prohibiting their friends from visiting the house, (*id.* at 298). Valdez was annually taken out of school to work in the beet fields of Colorado. (*Id.* at 297–98.)

At school, Valdez failed consistently, and, when entering sixth grade at 13, was administered the Wechsler Intelligence Scale for Children by a certified school district examiner. (Evid. Hrg. Trans. Vol. I, at 57–59; Pet.'s Ex. 3.) On this test, Valdez received I.Q. scores of 60 Verbal, 74 Performance, and 63 Full Scale.[3] (*Id.*

at 58.) Due to these low scores, Valdez was recommended for special education classes. (*Id.*) However, Valdez, who was failing every academic subject, dropped out of school before attending these classes. (*Id.* at 59.) Also, beginning at around age 14, Valdez frequently abused alcohol, marijuana, amphetamines, barbiturates, and a variety of inhalants. (Evid. Hrg. Trans. Vol. II, at 78; Pet.'s Ex. 2.)

In 1974, at age 18, Valdez was arrested in Hockley County, Texas for auto theft. (Pet.'s Ex. 2.) Valdez's court-appointed attorney recognized that Valdez may suffer from a mental deficiency of some sort, and so he obtained a court-ordered psychiatric evaluation. (Evid. Hrg. Trans. Vol. I, at 49–50.) The State's doctor diagnosed Valdez with "borderline intelligence" and "very mild signs of organic factor," attributing the latter to Valdez's long term abuse of inhalants. (*Id.* at 52; Pet.'s Ex. 2.) Like the school district, the doctor administered a Wechsler examination on Valdez. On this test, Valdez scored 64 Verbal, 65 Performance, and, again, 63 Full Scale.[4] (*Id.*) The doctor noted that Valdez's "fund of information" was poor, citing Valdez's inability to state the number of months in a year and to describe a thermometer. (*Id.*) The doctor also opined that Valdez's "judgment is impaired," that "his social skills are poor," and that his "chief defense is denial." (*Id.* at 52–53.)

Despite this harsh upbringing, history of academic failure, and habitual substance abuse, Valdez grew into some emotional maturity in his adulthood, as related by the friends and family members with whom he developed stable and loving relationships.[5] He was a positive influence on

---

3. The Wechsler test is administered to children or adults one-on-one by either a psychologist or a certified examiner. As the Supreme Court reported in *Penry v. Lynaugh,* 492 U.S. 302, 308 n. 1, 109 S.Ct. 2934, 2941 n. 1, 106 L.Ed.2d 256 (1989), individuals with I.Q. scores between 50–55 and 70 have "mild" retardation, and approximately 89% of retarded persons are "mildly" retarded.

4. Notably, Valdez received a 63 Full Scale score on both Wechsler exams. There is a nine point difference between his Performance scores, but this difference is not beyond the bounds of the standard deviation since the Wechsler test has an accuracy of plus or minus five points. (Evid. Hrg. Trans. Vol. I, at 353.)

5. The following description comes from various persons close to him, including Olga

the children of his siblings, pushing them to obey their parents, stay in school, and keep out of trouble. (Evid. Hrg. Trans. Vol. I, at 275–76, 279–80; *id.* Vol. II, at 180–82, 205–06, 210, 224–25.) His family testified to a history of non-violence, an aversion to confrontation, and devotion to family. (*Id.* Vol. I, at 245–46, 275–76, 301; *id.* Vol. II, at 181–82, 206–07, 223–24.)

In September 1986, Valdez was arrested on suspicion of burglary of a Corpus Christi bar. (State's Trial Ex. 100.) By that time, he had previously been convicted of five crimes (the aforementioned auto theft, two forgeries, burglary, and receipt of a firearm by a felon).[6] (State's Trial. Ex. 94–98.) The Judge of the 117th State Judicial District released Valdez on bond. In December 1986, he was arrested again on suspicion of a separate burglary. (State's Trial Ex. 99.) The same judge again released Valdez on bond, apparently not aware that there was also a federal warrant out for Valdez's arrest (for parole violations) at that time. (Trial Trans. Vol. XI, at 570.) In January 1987, Valdez appeared before the Judge of the 117th State Judicial District for arraignment, who allowed him to remain free on his bond. On September 9, 1987, while out on bond, Valdez was arrested on suspicion of murdering a police officer. This is the charge at the root of this petition.

## A. The Offense

On September 9, 1987, Sergeant J.D. Bock of the Corpus Christi Police Department was issuing a traffic citation on the roadside, when a car driven by Valdez passed by at a high rate of speed.[7] Bock shouted at Valdez and then pursued him in his squad car. An eyewitness testified at trial and indicated that Valdez was alone in his car when he passed Bock. Bock chased Valdez at speeds topping 100 m.p.h., and the chase apparently lasted until Valdez's vehicle blew a tire at the edge of a field outside of town. A driver who had followed the chase and then lost sight of the vehicles for about 30 seconds soon arrived at the scene. He saw Bock and Valdez wrestling, heard a gun discharge, and saw Bock bend over and fall down. The driver ran back to his own truck, heard a second shot, and then a third that went through his own rear window. As he drove away, the driver heard two more shots.

After a manhunt in the area, police officers found Valdez hiding in a field after running through a nearby farmhouse. The owner of the farmhouse, who spoke briefly with Valdez, was unharmed. In the farmhouse, underneath the cushions of a sofa, the police found Bock's service revolver. Bock's autopsy revealed that he was killed by four shots from his own gun, a .357 revolver.

Bock was only the third police officer killed in Corpus Christi history, and his shooting came as a staggering blow to the community. Local newspapers published over thirty stories about his tragic death, and the city dedicated a park in his memory.

## B. The Trial

The case was assigned once again to the 117th Judicial District. The court appointed Carl Lewis ("Lewis") as Valdez's de-

---

Quintanilla, his sister; David Valdez, his brother; Shirley Lopez, his sister; Cynthia Martinez, Valdez's niece; Monica Lopez, another niece; Mary Jane Barrientes, a friend; Alexandra Banuelos Rodriguez and Jo Anna Banuelos, Valdez's stepdaughters; and Julio Garcia, the Mayor of Robstown, Texas. All of these persons (except Garcia) claim that they would have testified at trial. (Evid. Hrg. Trans. Vol. I, at 284–85, 308–09, 331–32; *id.* Vol. II, at 185–86, 197–98, 211–12, 232–33.) Most did not; for those that did, their testimo-

ny was cursory and stilted. *See* discussion *infra,* pp. 775–76.

**6.** Also, the record before the Court indicates that, when twelve years old, Valdez was arrested for a burglary and placed in a youth facility.

**7.** A more detailed description of the entire incident is recounted in *Valdez v. State,* 776 S.W.2d 162, 164–65 (Tex.Cr.App.1989) (en banc).

fense counsel, who, at the time, had no experience trying capital cases.[8] (Evid. Hrg. Trans. Vol. I, at 21.) As his co-counsel, Lewis chose David Gutierrez ("Gutierrez"), who likewise had no experience representing capital defendants. (*Id.* at 21–22.)

Between the two of them, Valdez's attorneys spent a total of 59 hours preparing for his case.[9] (Pet.'s Ex. 6–7.) According to the fee applications of the two attorneys, none of this preparation time was spent searching for mitigating evidence in connection with the sentencing phase. (*Id.*) Lewis, in fact, logged no work at all between December 13, 1987 and April 21, 1988. The trial began on May 2, 1988. (Evid. Hrg. Trans. Vol. I, at 32–33; Pet.'s Ex. 6.) Gutierrez spent less than 3 hours on trial preparation after December 13, 1987, none of which concerned the sentencing phase. (Evid. Hrg. Trans. Vol. III, at 90, 105, 136; Pet.'s Ex. 7.) The attorneys' fee applications reflect that Lewis spent about 9 hours visiting Valdez prior to trial while Gutierrez spent about 2 hours with him. (Pet.'s Ex. 6–7.) These documents also indicate that Lewis spoke just once with one of Valdez's family members (a twelve-minute phone conversation in October 1987 with a woman identified as Valdez's wife[10]), (Evid. Hrg. Trans. Vol. I, at 33; Pet.'s Ex. 6), and that Gutierrez met just once with unidentified family members for about half an hour in November 1987, (Pet.'s Ex. 7). According to a family member at that meeting, Gutierrez asked

no questions about Valdez's background nor otherwise requested any assistance in connection with the sentencing phase. (Evid. Hrg. Trans. Vol. I, at 306–07.) Despite having funding for an investigator, his attorneys did not hire one to assist them. (*Id.* at 29.) Due to the notoriety of the case among the local law enforcement population, the local investigators contacted by Lewis and Gutierrez refused to assist. (*Id.* at 26, 105; *id.* Vol. III, at 132.) Lewis did not make any attempt to interview or hire investigators from outside Corpus Christi. (*Id.* Vol. I, at 27; *id.* Vol. III, at 132.)

While Lewis and Gutierrez did review the "penitentiary packs" provided to them by the State,[11] (*id.* Vol. I, at 47), they did not subpoena or gather any documents which could support a case for mitigation, (Pet.'s Ex. 6–7). Since the attorneys did not obtain Valdez's school records, (Evid. Hrg. Trans. Vol. I, at 55; *id.*, Vol. III, at 154–55), they did not learn that he tested as mentally retarded in sixth grade and was recommended for special education,[12] (*id.* Vol. I, at 57–60; Pet.'s Ex. 3). Since they did not obtain complete pleadings regarding his 1974 Hockley County conviction, (Evid. Hrg. Trans. Vol. I, at 48, *id.* Vol. II, at 154), they did not learn that the State's doctor also found his test scores to indicate mental retardation, (*id.* Vol. I, at 49–53; Pet.'s Ex. 2). Similarly, since they did not obtain full records regarding his previous convictions, (Evid. Hrg. Trans. Vol. I, at 48; *id.* Vol. III, at 97), the

---

**8.** Two weeks prior to Valdez' trial in May 1988, Lewis finished a capital trial in which the client was also sentenced to death. (Evid. Hrg. Trans. Vol. I, at 22–24.)

**9.** Gutierrez stated that he did not record time for phone calls which were only a few minutes. (Evid. Hrg. Trans. Vol. III, at 90.) Lewis speculated that some of the hours logged might have been spent discussing sentencing issues with family members prior to trial, but could not recall which ones. (*Id.* Vol. I, at 43–44.) Both attorneys testified that their fee applications were fairly accurate. (*Id.* Vol. I, at 32; *id.* Vol. III, at 90.)

**10.** While he lived with a girlfriend, Valdez was not married.

**11.** A "penitentiary pack" or "pen pack" consists chiefly of the judgment and sentencing order from the underlying criminal case. (*E.g.*, State's Trial Ex. 94.) It does not include pleadings or pretrial motions from that case, police reports, psychological examination records, or school records. (Evid. Hrg. Trans. Vol. I, at 47–48.)

**12.** Valdez's school records were located less than one block from the courthouse in which his capital trial occurred.

attorneys did not learn that the underlying facts of those convictions reflected the activities of a somewhat hapless thief, rather than a violent and calculating criminal.[13] (State's Trial Ex. 94–98.) Nor did they speak to Valdez's family or friends in order to learn of his humanizing qualities. (Evid. Hrg. Trans. Vol. I, 85–88; *id.* Vol. III, at 161.) Lewis and Gutierrez also never learned that, in the seven months Valdez spent in the Nueces County Jail between his arrest and trial, he was described by his supervisor as a well-behaved, well-adjusted, and disciplined member of prison society. (*Id.* Vol. I, at 76–77, 263–67.)

According to Lewis and Gutierrez, as they entered the guilt/innocence phase of the trial, it was already determined that Valdez would take the stand and give an alibi. (*Id.* Vol. I, at 155–56; *id.* Vol. III, at 126.) At voir dire, however, counsel focused extensively on the jurors' views of self-defense, provocation, and police brutality, (*id.* Vol. III, at 126; *e.g.*, Trial Trans. Vol. V, at 213–16), and then promptly dropped these issues thereinafter at trial. Valdez insisted on telling the jury the following alibi: a man he knew only as "Chico" was riding with him when Bock pulled him over; as Bock was arresting Valdez, Chico shot Bock with his (Chico's) own .38 caliber pistol; Chico then took his packages of drugs from Valdez's car and disappeared, running into the adjacent field. (Trial Trans. Vol. XII, at 756–60.) Lewis reported that this alibi was met by the jury and courtroom crowd with sighs, eye-rolling, and snickering. (Evid. Hrg. Trans. Vol. I, at 122.) In a bench conference, the trial judge told the attorneys that "never in [his] career" had he heard an alibi like the one which Valdez had just told. (Trial Trans. Vol. XII, at 777.)

The jury found Valdez guilty on a Friday afternoon. (*Id.* Vol. XII, at 923.) On the following Monday morning, the State put on its case for the sentencing phase. The State introduced penitentiary packets corresponding to Valdez's previous convictions, and produced evidence as to two other burglary arrests. (*Id.* Vol. XIII, at 7–79.) When the State closed, the defense attorneys expressed to the judge their desire to use the lunch break to figure out what witnesses, if any, they would present in Valdez's case for mitigation. (*Id.* at 79.) The following colloquy took place:

> Mr. Jones [14]: The State rests.
>
> The Court: Are you all ready?
>
> Mr. Lewis: Your Honor, we'd like to break for lunch at this time.
>
> The Court: Come up just a second.
>
> (At this time the following whispered bench conference was held:)
>
> The Court: Do you have anybody to present now?
>
> Mr. Lewis: We have some people that we want to filter through, and I'd be rushed into deciding to call somebody up.
>
> The Court: You had all weekend.

(*Id.* at 79–80.) The court then dismissed the jury and again asked the defense attorneys if they would have any mitigating evidence. Gutierrez replied: "We need to find out." The Court responded, "You need to find out?" "Yes, sir," said Gutierrez. (*Id.* at 80.) The Court's surprise at Gutierrez's response was apparent.

Lewis then went out to the hall where Valdez's family and friends were congregated. None of them had been subpoenaed or asked to attend the trial; the individuals present simply happened to be there on that day out of their concern for the proceedings. (Evid. Hrg. Trans. Vol.

---

**13.** For example, in attempting a forgery, Valdez took a blank personal check that he found, wrote his own name in the payee blank, signed the check with his own name, and presented the check for cashing. (State's Trial Ex. 94.) When arrested once for burgla-

ry, he had broken into a closed bar in order to take the change from the cigarette machine. (Trial Trans. Vol. XIII, at 77–78.)

**14.** Assistant District Attorney.

I, at 308, 331; *id.* Vol. II, at 228.) It appears that Lewis then briefly interviewed, for the first time, those who were willing to testify.[15] (State Habeas Hrg. Vol. I, at 61–62; Evid. Hrg. Trans. Vol. I, at 42; *id.* Vol. II, at 227–32.) According to Gutierrez, some of Valdez's friends and family were afraid to testify because they were worried about police officer retaliation. (Evid. Hrg. Trans. Vol. III, at 98–99.) Lewis arranged to present five character witnesses.

After lunch, Lewis successfully called four of these five witnesses.[16] In brief examinations that reflected no advance preparation, Lewis elicited cursory testimony to the effect that Valdez was a pleasant individual who especially cared for children. (Trial Trans. Vol. XII, at 81–98.) In the printed trial transcript, the testimony of these four witnesses totals less than twenty pages, including the taking of oaths, bench conferences, and cross-examination. When Lewis attempted to call one of the five witnesses, the bailiff announced in the presence of the jury: "He is not outside, and this other witness says he is not coming." (*Id.* at 87.) Except for an unsworn statement by Valdez (where he both asserted his innocence and expressed his contrition), (*id.* at 120–21), the defense attorneys presented no other evidence in mitigation.

Lewis's closing argument largely omitted any mitigating factors surrounding Valdez's character or the circumstances of the shooting, and completely neglected to mention the non-violent nature of Valdez's prior convictions. (*Id.* at 121–30.) The jury returned answers to the special sentencing issues which mandated a penalty of death.

## C. Habeas Corpus Proceedings

After his direct appeals failed, Valdez filed a state habeas petition. In November 1990, the state habeas judge held a two-day evidentiary hearing. Valdez's primary argument at that hearing was that his attorneys had rendered ineffective assistance of counsel at trial. (State Habeas Hrg. Trans. Vol. I, at 1–16.) No further action was taken on the petition until February 1997. At a hearing on the petition, the state habeas judge stated "I have never read the record of the trial and I don't intend to. I don't have the time."[17] (State Hrg. on Prop. Find. & Concl. Law, 144–45.) The judge also stated that the court could not locate the exhibits that were admitted into evidence at the November 1990 hearing. (*Id.* at 148–49.) In March 1997, apparently without having located those exhibits and without having requested replacements for them, the judge denied Valdez's habeas petition, entering findings of fact and conclusions of law that essentially repeated verbatim the State's proposed findings and conclusions. (Trial Ct.'s Find. Fact & Concl. Law.) The Texas Court of Criminal Appeals then denied relief in a one page order. (Ct.Crim.App.Order.)

On January 30, 1998, Valdez timely filed the instant § 2254 petition. On January 11, 1999, this Court granted Valdez's motion for an evidentiary hearing on the issue of whether his Sixth Amendment right to effective counsel had been violated during the sentencing phase. Finding that the state habeas court's own errors had pre-

---

**15.** Within Lewis' case file, there are notes reflecting brief interviews with four persons: Daniel Valdez, Mary Jane Barrientes, Maria Irma Saldana, and Sammy Quintanilla. (Evid. Hrg. Trans. Vol. I, at 99.) Three of these four persons testified. Since Lewis reported just one phone call with Valdez's "wife" in preparation for the trial and since this is the only interview session Lewis can recall, it appears that these notes were made during the impromptu interviewing session.

**16.** He called Daniel Valdez, one of Valdez's seven siblings; Mary Jane Barrientes, a former girlfriend of Valdez; Julia Saldana, the current girlfriend of Valdez; and Marcia Irma Saldana, the mother of Julia Saldana.

**17.** The trial judge having recused, the habeas judge did not have the benefit of sitting at the trial.

vented Valdez from properly presenting his evidence of this ineffective assistance argument to the state habeas court, the Court determined that 28 U.S.C. § 2254(e)(2) did not bar an evidentiary hearing in federal court. *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998); *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir.1998). The Court also found that Valdez had not received a "full and fair" evidentiary hearing, *Townsend v. Sain*, 372 U.S. 293, 312–13, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), *overruled on other grounds, Keeney v. Tamayo–Reyes*, 504 U.S. 1, 5, 112 S.Ct. 1715, 1717, 118 L.Ed.2d 318 (1992), and therefore that he was entitled to an evidentiary hearing on the issue. *Wiley v. Puckett*, 969 F.2d 86, 98 (5th Cir.1992).[18]

From June 21 through 23, 1999, this Court held an evidentiary hearing where Valdez's counsel presented evidence excluded from consideration by the State Court. Furthermore, both parties thoroughly presented evidence and argument on the issue of whether Lewis and Gutierrez satisfied their constitutional duty to investigate Valdez's case. At the Court's request, the parties also submitted briefing on this issue. The Court now considers Valdez's claim of ineffective assistance of counsel in light of this newly-presented evidence and the evidence already in the record.

## IV. DISCUSSION

### A. Standard of Review

Since Valdez did not file his federal habeas petition until 1998, the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") applies to this case. Subsection (d) of AEDPA limits the ability of federal courts to grant habeas relief to state prisoners. When reviewing a question of fact, a federal court may grant relief if the state court adjudication of the claim " 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence.' " *Drinkard v. Johnson*, 97 F.3d 751, 767 (5th Cir.1996) (*quoting* 28 U.S.C. § 2254(d)(2)). "[W]hen reviewing a mixed question of law and fact, a federal court may grant habeas relief only if it determines that the state court decision rested on 'an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court,' to the facts of the case." *Id.* at 768 (*quoting* 28 U.S.C. § 2254(d)(1)). "When reviewing a purely legal question, a federal court may grant habeas relief only if it determines that a state court's decision rested on a legal determination that was 'contrary to ... clearly established Federal law, as determined by the Supreme Court.' " *Id.*

Nevertheless, these standards of review largely do not apply since this Court has held an evidentiary hearing in order to consider evidence improperly excluded from consideration by the state habeas court. In denying Valdez's writ, the state habeas court entered twenty findings and conclusions which pertain to Valdez's claim for ineffective assistance of counsel. A few of these findings were specific and apparently were not tainted by the fact that the state habeas judge had effectively excluded from evidence some of the most critical evidence of ineffective assistance of counsel.[19] The Court will pre-

---

**18.** The Court also found that, even if Valdez was not entitled to a hearing, it was proper to exercise its discretion to grant one.

**19.** Most importantly, it appears that the state habeas judge excluded (1) the trial transcript showing the stark lack of preparation of defense counsel for the sentencing phase as well as the prejudice resulting from the lack of preparation, (2) the attorneys' fee applications showing an utter lack of investigation into

Valdez's background, and (3) the consistent Wechsler test scores showing Valdez to be mentally retarded. Since the state habeas judge excluded this evidence from his consideration, it appears he did not factor such elements into his conclusion that the defense attorneys conducted an adequate investigation.

sume that the specific and therefore untainted findings and conclusions of the state habeas court are correct;[20] however, since this Court has held an evidentiary hearing to consider evidence excluded from consideration by the state habeas judge, the Court will not defer to the more general conclusions that the attorneys conducted a reasonable investigation and that Valdez suffered no prejudice from the lack of presentation of a case of mitigation. That is, the Court addresses the ultimate conclusion regarding ineffective assistance of counsel without the presumption that the state court's conclusion was correct. *Miller*, 161 F.3d at 1254 (holding that the "presumption of correctness does not apply ... if the habeas petitioner did not receive a full, fair and adequate hearing in the state court proceeding on the matter sought to be raised in the habeas petition") (*citing Nguyen v. Reynolds*, 131 F.3d 1340, 1359 (10th Cir. 1997), *cert. denied*, 525 U.S. 852, 119 S.Ct. 128, 142 L.Ed.2d 103 (1998)).

## B. Ineffective Assistance of Counsel

■ The Sixth Amendment " 'right to counsel is the right to the *effective assistance* of counsel' " for the reason that counsel plays "a role that is critical to the ability of the adversarial system to produce just results." *Strickland v. Washing-*

*ton*, 466 U.S. 668, 685–86, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) (*quoting McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970) (emphasis supplied)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[21] *Id.* at 686, 104 S.Ct. at 2064. Thus, to prevail on his ineffective assistance of counsel claim, Valdez must demonstrate both that his attorney's performance was deficient and that the deficiency prejudiced his defense. *Id.; Davis v. Johnson*, 158 F.3d 806, 812 (5th Cir. 1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1474, 143 L.Ed.2d 558 (1999). The Fifth Circuit has determined that both prongs of the *Strickland* test involve mixed questions of law and fact. *Nobles v. Johnson*, 127 F.3d 409, 418 (5th Cir.1997), *cert. denied*, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998).[22]

## 1. Deficient Performance of Counsel

Valdez's fundamental complaint is that his attorneys failed to conduct a reasonable investigation into his background, that this failure was *not* the result of a strategic decision, and that this failure seriously

20. The most significant of these specific findings and conclusions are the following: "9. It is common in the Corpus Christi, Nueces County, Texas area for Hispanic males to drop out of school; 10. The fact that applicant had dropped out of school did not put Carl Lewis on notice of any potential mental problem of applicant, if any; 11. Carl Lewis's failure to request the entire court jacket regarding applicant's burglary charge in Hockley County did not fall below the professional standard of conduct for defense attorneys." (Trial Ct.'s Find. Fact & Concl. Law.) Of course, these discrete findings and conclusions do not in themselves mandate a general finding that the Lewis and Gutierrez rendered constitutionally effective assistance of counsel.

21. The constitutional norms by which effectiveness of counsel is measured extend equal-

ly to the guilt and sentencing phases of capital trials. *Baldwin v. Maggio*, 704 F.2d 1325, 1332 (5th Cir.1983).

22. Normally, under the AEDPA deference scheme, a federal court will not disturb a state court's application of law to facts unless the state court's conclusions involved an "unreasonable application" of clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1); *see Davis*, 158 F.3d at 812. However, as explained above, since the Court held an evidentiary hearing to consider substantial evidence which was improperly (and, apparently, largely accidentally) excluded by the state habeas judge, this Court need not defer to the general conclusions of the state habeas judge regarding the deficiency of the attorneys' investigation and the resulting prejudice to Valdez. *See* discussion *supra*, pp. 777–78.

prejudiced his case at the sentencing phase of his trial. In particular, Valdez brings evidence that his attorneys' entire investigation into his background consisted of the following: (1) one 12–minute phone call with someone inaccurately described as his "wife;" (2) one 30–minute conference with family members in one of the attorney's offices; (3) about 11 hours spent visiting Valdez in jail (without ever asking specific questions about his family background, upbringing, mental condition, etc.);[23] and, (4) the extemporaneous lunch break interviews with about five family members and friends. The evidence that these acts were the extent of the attorneys' investigation is unrebutted and appears accurate, and therefore the Court FINDS that these acts substantially compose the entirety of the attorneys' investigation into Valdez's background.

Further, Valdez complains that this superficial investigation failed to reveal substantial mitigating evidence that would have convinced at least one juror to refuse to choose the death penalty for him. That substantial yet undiscovered evidence consists primarily of the following: the two Wechsler exams showing mental retardation, the school records placing Valdez in special education, the consistent testimony of siblings that Valdez's father specially focused his physical abuse on Valdez as a child, the testimony from family and friends as to his redeeming personal qualities despite this history of abuse, the testimony of the Nueces County Jail Supervisor that Valdez had been a "model prisoner" while awaiting his capital trial, and the fact that the underlying circumstances of his previous convictions suggest that Valdez was a thief but not a violent criminal.

■ In *Strickland,* the Supreme Court offered a non-exhaustive list of the basic duties owed by counsel to the criminal defendant—viz., a duty of loyalty, a duty to avoid conflicts of interest, a duty to advocate the defendant's cause, the duty to consult with the defendant on important decisions, the duty to keep the defendant informed of important developments in the course of the prosecution, and the "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." 466 U.S. at 688, 104 S.Ct. at 2065. An attorney's performance of such duties is deficient only when the representation falls below an objective standard of reasonableness: "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 687–88, 104 S.Ct. at 2064–65. This Court's review of the performance of Lewis and Gutierrez must be " 'highly deferential,' " and the Court " 'must make every attempt to eliminate the distorting effects of hindsight.' " *Davis,* 158 F.3d at 812 (*quoting Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.) Nevertheless, this measure of deference to the trial counsel " 'must not be watered down into a disguised form of acquiescence.' " *Bouchillon v. Collins,* 907 F.2d 589, 595 (5th Cir.1990) (*quoting Profitt v. Waldron,* 831 F.2d 1245, 1248 (5th Cir. 1987)).

■ In particular, the *Strickland* court explained that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. at 2066. ·If counsel can explain why his or her reasonable decision made a particular investigation unnecessary, then counsel was not ineffective. *Loyd v. Whitley,* 977 F.2d 149, 158 and n. 22 (5th Cir.1992) (gathering cases where the strategic decision excuse has been the "pivotal point"); *Cook v. Lynaugh,* 821 F.2d 1072, 1078 (5th Cir.1987) (finding ineffective assistance with emphasis on fact that failure to investigate was not strategic choice). Still, "[t]he Court is ... not required to condone unreasonable decisions

---

**23.** Lewis testified during the instant hearings that these meetings were geared toward the guilt/innocence phase of the trial. (Evid. Hrg. Trans. Vol. I, at 43–45.)

parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson,* 185 F.3d 244, 261 (5th Cir.1999) (finding ineffective assistance where counsel failed to investigate, inter alia, background information concerning defendant's childhood abuse and impaired mental functioning).

■■■ "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. As the Fifth Circuit has explained, the nature of the case can bear some relation to the type of pretrial investigation required and that at least a minimal investigation must be done in any event:

> Although the scope of the required investigation is a function of the number of issues in the case, the relative complexity of those issues, the strength of the government's case and the overall strategy of trial counsel, this circuit has recognized that, at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case.

*Nealy v. Cabana,* 764 F.2d 1173, 1177 (5th Cir.1985). The severity of the sentence faced by a defendant in a capital case is an important factor to be weighed in the effective assistance determination. *Washington v. Watkins,* 655 F.2d 1346, 1357 (5th Cir.1981). Furthermore, the attorney's duty to investigate is not diminished by the fact that counsel was appointed rather than retained and possibly limited to a fee cap. *Bouchillon,* 907 F.2d at 597 (noting that "there is a duty to investigate

which cannot be abridged because counsel is only appointed, not retained").

■■■ This duty to make such a pretrial investigation can play a significant role where there is evidence that the defendant suffers from some type of mental deficiency. *Moore,* 185 F.3d 244, 270. Because a criminal defendant frequently makes only a limited appearance before the court, the Fifth Circuit has recognized that the defense counsel is "the sole hope" that a mental deficiency will be brought to the attention of the court. *Bouchillon,* 907 F.2d at 597. The Supreme Court has also attached special importance to mitigating evidence concerning a capital defendant's good behavior while in prison, insofar as it bears on features of the defendant's character that militate against a claim of future dangerousness. *Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986), *aff'd in part and rev'd in part on other grounds, Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Finally, counsel has a duty to investigate the nature of defendant's prior criminal history, especially when evidence of these previous crimes is likely to be raised by the prosecution at trial. *Moore,* 185 F.3d 244, 273–74.

Since the Court has found that the attorneys' investigation consisted of the four elements listed above,[24] the question for the Court is whether such an investigation into Valdez's background was reasonable under the circumstances.

■■■ Generally, any lawyer who tries capital murder cases knows that he or she "has a duty to investigate the client's life history, and emotional and psychological make-up" through an "inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology, and present feelings." Gary Goodpast-

---

**24.** Namely: (1) one 12–minute phone call with someone inaccurately described as his "wife;" (2) one half-hour conference with family members in attorney office; (3) about 11 hours spent visiting Valdez in jail (without

ever asking specific questions about his family background, upbringing, mental condition, etc.); and, (4) the extemporaneous lunch break interviews with about five family members and friends.

er, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U. L.Rev. 299, 320, 323–24 (1983). Since the acquisition of mitigation evidence is so critical in any capital case, preparation for the sentencing phase must begin when counsel is first appointed. (*Id.* at 320.) Although Lewis and Gutierrez acknowledged throughout the record that they were aware of this duty, (Evid. Hrg. Trans. Vol. I, at 25–26; *id.* Vol. III, at 83), their performance demonstrates a complete lack of attention to it. Moreover, their deficiencies did not arise from any informed application of novel or esoteric legal tactics; rather, their deficiencies resulted from their total failure to perform rudimentary trial preparation and presentation tasks.

In this case, the State had a solid case for guilt since it had a witness of the struggle who heard the multiple gun shots and since forensic evidence showed that Bock was killed with his own handgun. The only possible rebuttal to the State's case on the guilt/innocence issue would be a denial of the shooting in direct contradiction of the State's evidence;[25] and, when Valdez tried this approach, he apparently provoked indignant disbelief from the jury. Thus, in these circumstances where there were no complex issues regarding guilt/innocence, the attorneys had reason to focus primarily on the case for mitigation, and, consequently, their "minimum" duty to interview potential witnesses and investigate the case rested relatively heavily on their preparation for the sentencing phase.

Nevertheless, the attorneys made essentially no investigation into Valdez's background, even though the vast majority of it was available in Corpus Christi, where Valdez had lived most of his life. The attorneys never visited the family in their homes, and it appears they made no efforts to instigate (or even respond to) communications with potential witnesses for mitigation.[26] Even the impromptu lunch break interviews with friends and family appear to have consisted mainly of a discussion of Valdez's character, rather than his background.[27] The attorneys did not look at his local school records even though Valdez had dropped out at an early age. Except to review the penitentiary packets provided by the State, the attorneys did not look into his criminal history even though they were on notice that the State would use those prior convictions at the sentencing phase and even though Lewis himself had questions about the Hockley County conviction. (Trial Trans. Vol. XIII at 3–6.) The attorneys did not subpoena or order a single document useful as mitigating evidence. Finally, the attorneys cannot recall having asked Valdez any questions about his upbringing or family life, and it appears they did not in fact ask any such questions since they learned nothing about it.

25. Gutierrez emphasized that he believed the best strategy would have been for Valdez to admit to having shot Bock, but to claim mitigation due to the fact that it occurred during the struggle. (Evid. Hrg. Trans. Vol. III, at 76–77.) This approach was foreclosed when Valdez decided to relate his alibi. As Gutierrez suggested, Valdez could have relied mostly on his own confession, which was tape recorded after his arrest. (*Id.* at 75.)

26. The Court notes that it is possible that Lewis took the affirmative action of calling a woman he believed to be Valdez's wife, although it is equally possible that she called him. While the attorneys mailed two letters to potential witnesses, it appears that these witnesses were sought for the guilt/innocence case. (Evid. Hrg. Trans. Vol. III, at 145–48.) Finally, Gutierrez's fee application reports a single conference with the family in his office; Valdez's sister, Olga Quintanilla, testified that she went looking for the attorneys one time and ended up speaking to an attorney other than Lewis. (*Id.* Vol. I, at 305.) Most likely, this meeting was Gutierrez's reported interview. Quintanilla also testified that she left several messages for Lewis but they were never returned. (*Id.*)

27. This is evident from the testimony elicited from the witnesses at trial and from the notes Lewis made during the interviews.

The State contends that the attorneys should not be faulted for failing to find the evidence of mental retardation (i.e., the Wechsler test scores in his school and Hockley County records) since they had no reason to believe Valdez might be mentally retarded, (Evid. Hrg. Trans. Vol. I, at 61; *id.* Vol. III, at 96), and consequently had no reason to affirmatively search for evidence of mental retardation. Basically, this argument is flawed because it ignores the fact that the attorneys did not conduct even the preliminary investigation required by *Nealy, supra.* If they had conducted a minimal investigation into Valdez's background, the attorneys would have discovered many "red flags" suggesting mental retardation, in addition to the one red flag that they did discover, namely, that Valdez had dropped out of school at an early age. (Evid. Hrg. Trans. Vol. I, at 56.) These red flags include the following facts:[28] Valdez was placed in special education, he had a history of drug and alcohol abuse from an early age, he was physically abused as child, and he had been evaluated by a psychologist as a youth. Further, they could have ascertained other facts suggesting mental retardation: that Valdez never lived on his own, never was able to hold a steady job, and only performed menial work.[29] (*Id.* Vol. I, at 302, 329–30; *id.* Vol. III, at 159.) Notably, it appears that it was precisely such a preliminary investigation that prompted Valdez's court-appointed attorney to seek a mental examination of Valdez when he was arrested for car theft in Hockley County in 1974. The circumstances surrounding Valdez's bungled commission of his prior forgeries and thefts were similarly telling, (*id.* Vol. II, at 117), as was

Valdez's insistence on presenting an alibi defense that both Lewis and Gutierrez found to be illogical and unbelievable, (*id.* Vol. III, at 77.) In sum, it was the attorneys' own fault of failing to do a basic background investigation that led directly to their failure to request the state court records, to obtain the school records, or to even ask a few specific questions about Valdez from their client or his family.

█ Thus, if the attorneys had performed even minimal pretrial interviews, they would have had reason to believe that Valdez might be mentally retarded. When counsel is on notice of a potential mitigating factor, counsel must make a more thorough and independent investigation into the defendant's background for substantiating evidence. *Ransom v. Johnson,* 126 F.3d 716, 723 (5th Cir.1997) ("When counsel is on notice of potential mitigating factors, counsel is no longer justified in relying exclusively on the defendant for information")[30]; *see also Mauldin v. Wainwright,* 723 F.2d 799, 800 (11th Cir.1984) (imposing an affirmative duty on counsel to obtain petitioner's medical records where counsel had reason to believe that petitioner's best defense would rest on mitigating evidence of alcoholism). While the Court agrees with the state habeas court that Lewis was not required to obtain Valdez's school records (and the Wechsler score) simply because he learned that Valdez had dropped out of school, it is also true that, had the attorneys done a *minimal* pretrial investigation, they would have been on notice that Valdez might be mentally retarded; consequently, the attorneys did have a duty to look at those

28. Dr. Price, the psychologist expert witness called by Valdez, agreed that these elements were "red flags" suggesting mental retardation. (Evid. Hrg. Trans. Vol. II, at 96–97.)

29. When not in jail, Valdez has worked primarily doing temporary work on construction sites. Testimony suggested that Valdez also sometimes worked as a drug courier or "mule." Within prison, Valdez now works folding clothes.

30. Although the *Ransom* court ultimately found that the petitioner had not suffered prejudice due to his counsel's failure to discover evidence of his abuse as a child, that court suggested that his counsel's conduct had been unconstitutionally deficient since counsel had some knowledge of the petitioner's family life and therefore had some reason to search for evidence of child abuse. *Id.*

school records. For the same reason, they had a duty to obtain full sets of Valdez's · prison records and to direct specific questions about Valdez's background to Valdez and his family.[31] If the attorneys had taken any of these steps, they would have learned that Valdez had been tested as mildly mentally retarded by a certified examiner and that strong evidence of mental retardation could be presented in mitigation.[32]

With respect to the evidence of mental retardation, the State presents an argument based on the fact that, within the penitentiary packets in Lewis' possession, there were four "Social Criminal History Reports" prepared by the Texas Department of Corrections in 1974, 1978, 1981, and 1983, which indicated that Valdez had an I.Q. of 88, 95, 96, and 87, respectively. (Evid. Hrg. Trans. Vol. I, at 142–50.) In essence, the State contends that the attorneys reasonably relied upon those statements regarding Valdez's I.Q., and, in reliance on those statements, they decided that Valdez was not mentally retarded and also affirmatively decided not to make further inquiry into his background and mental condition.

Assuming, arguendo, that Lewis and Gutierrez both read the penitentiary packets thoroughly and thus saw these I.Q. reports, this argument still fails for several reasons. First, even if Valdez was not mentally retarded, the attorneys had a duty to make a minimal pretrial investigation into his background, and, as explained above, the "red flags" discovered in that investigation should have led them to suspect either that Valdez was mentally retarded or that, at the very least, there might be evidence of a mental condition in

his school or prison records. Second, when counsel has a reason to believe there may be available mitigating evidence of a mental defect (as the attorneys here would have had if they had conducted a minimal pretrial investigation), counsel is not absolved of the duty to seek evidence of that mental defect due to the simple fact that there exists some contrary medical evidence. *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir.1987). Thus, the existence of the apparently normal I.Q. scores in the penitentiary packets did not relieve the attorneys of their duty to investigate Valdez's background and his mental condition.

Valdez also asserts that his attorneys failed in their duty to investigate by failing to discover evidence that he was abused as a child, that he had many redeeming, humanizing qualities, and that his prior convictions might show a bumbling thief rather than a violent criminal. As the Supreme Court announced in *Penry v. Lynaugh*, 492 U.S. 302, 316, 109 S.Ct. 2934, 2945, 106 L.Ed.2d 256 (1989): "[I]n capital cases the fundamental respect for humanity underlying the Eight Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (*quoting Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)). This Court has already determined that the attorneys should have discovered the fact of child abuse by doing the requisite, minimal pretrial interviews with Valdez and potential witnesses. Any mitigating personal attributes could have been discovered

31. Also, it appears that, since Lewis had questions about the Hockley County conviction, (Trial Trans. Vol. XIII at 3–6), he had an independent reason to seek the entire record of that particular conviction.

32. Habeas petitions which allege that counsel was ineffective for failing to properly investigate frequently turn on whether or not counsel can explain why a strategic decision

foreclosed the apparent need to investigate a certain type of evidence. Notably, the State can make no assertion that the attorneys' failure to make the preliminary interviews was a strategic decision; rather, since the most promising strategy was clearly to work on the case for mitigation, there was a premium on conducting a background investigation.

through the same, obvious means. With respect to the evidence of the nature of his prior crimes, the attorneys had a duty to at least inquire into the circumstances of those crimes since the State had indicated that it was going to use evidence of those prior convictions at the sentencing phase. *Moore*, 185 F.3d 244, 273–74. In failing to emphasize the evidence on record that Valdez had a non-violent criminal past, counsels' performance was unreasonably deficient. *Cf. id.* at 261 (finding ineffective assistance where counsel failed to respond to prosecution's misleading characterization of defendant's criminal record).

Finally, Valdez asserts that his attorneys failed to learn or develop that he was a model prisoner while awaiting his capital trial. With respect to the "model prisoner" evidence, Lewis testified that he knew that Valdez had a clean record while being held for the capital trial, (Evid. Hrg. Vol. I, at 76–77), but believed that such evidence would not be worth much as mitigation, (*id.* at 78–80). Lewis also stated he was afraid that, since the case involved the shooting of a police officer, other law enforcement officers would have been reluctant to testify as to Valdez's clean prison record. (*Id.* at 128–29.) At the 1990 and 1999 evidentiary hearings, Valdez presented testimony of the jail supervisor who would have testified at trial that Valdez was a "model prisoner" when held in jail before his trial. (Evid. Hrg. Trans. Vol. I, at 264, 267.) At the 1990 evidentiary hearing, one of the supervisor's subordinates testified that Valdez was a "normal inmate" but not a "model prisoner" because he had incurred ·a few minor infractions. (State Habeas Hrg. Vol. II, at 387–88.)

"Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 104 S.Ct. at 2066. Here, the attorneys did not investigate whether or not there was a witness who would give favorable testimony regarding Valdez's behavior as an inmate in the county jail. Thus, the question is whether the attorneys made a reasonable professional judgment to refrain from looking for a witness who was willing to testify as to the truth of the matter—i.e., that Valdez had a clean record in the jail. There are three factors which the Court should consider in the circumstances: (1) this evidence would be of primary importance in making a showing that Valdez did not pose a threat of future dangerousness to a prison population, (2) the attorneys did not spend time collecting any other mitigating evidence, and (3) documentary evidence of his clean record most likely existed. Given these considerations, it was unreasonable for the attorneys to decide not to seek a witness to testify on Valdez's behalf.[33] Indeed, as the Supreme Court noted in *Skipper*, the testimony of disinterested witnesses with "no particular reason to be favorably predisposed towards one of their charges ... would quite naturally be given greater weight by the jury."[34] 476 U.S. at 8, 106 S.Ct. at 1673. At the very least, the attorneys could have obtained jail records reflecting Valdez's obedience since those records could not vacillate at trial. This Court refuses to condone such an injudicious and uninformed decision on the part of counsel merely "parading under the umbrella of strategy." *Moore*, 185 F.3d 244, 261.

**33.** Dr. Price, Valdez's expert psychologist, noted that people who are mentally impaired, like Valdez, do best in a highly structured environment, such as prison. (Evid. Hrg. Trans. Vol. II, at 121–22.) Thus, it is likely that counsel's failure to discover Valdez's mental infirmities reinforced their already questionable decision not to investigate his prison behavior.

**34.** Lewis admitted at the evidentiary hearing that, at the time of trial, he was not aware of the *Skipper* case nor the rule announced therein. (Evid. Hrg. Trans. Vol. I, at 75.)

Nor was counsel's failure to thoroughly investigate and present mitigating evidence born of some tactical fear of "opening the door" to evidence of prior bad conduct or criminal convictions. First, counsel never reached the threshold level of investigation that would have produced an informed decision not to use mitigating evidence because of its potentially prejudicial backlash. Moreover, by the time counsel put on their "case" in the sentencing phase, the State itself had already opened the door to a complete history of Valdez's most significant prior felony convictions and his most recent acts of theft and burglary.[35] Thus, rather than giving the State some golden opportunity for impeachment that it otherwise would not have had, the evidence of Valdez's mental retardation, good prison record, and redeeming human qualities would have strongly mitigated or refuted the damaging evidence that the jury had already heard. (Evid. Hrg. Trans. Vol. I, at 219–32.) Finally, Lewis admitted at the evidentiary hearing that he would have used the available evidence of mental retardation and redeeming personal attributes had he only known of such evidence, (id. Vol. I, at 55, 88), while Gutierrez stated that he and Lewis "weren't concerned" about backlash from presenting evidence of Valdez's mental condition, (id. Vol. III, at 121–22). There was simply no conceivable strategic reason for not investigating and presenting any of this mitigation evidence.

Valdez also contends that his attorneys failed to conduct a reasonably effective voir dire of potential jurors. As Wayne Huff, Valdez's legal expert, testified at the state habeas proceeding, competent capital defense lawyers try to develop a sentencing strategy well before voir dire to allow

them to question potential jurors about mitigating evidence that will be offered in the sentencing phase. (Evid. Hrg. Trans. Vol. I, at 197–99.) In this case, however, the voir dire alone demonstrates that Valdez's counsel had not developed such a strategy. Counsel categorically failed to ask the prospective jurors any questions about their feelings regarding mitigating evidence, their ability to distinguish guilt from the special issues relating to deliberateness and future dangerousness, the use of psychiatric evidence and testimony, or any other matters pertinent to the sentencing phase. (Id. at 209–11.) Given the strength of the State's case in the guilt/innocence phase, the need to prepare for the sentencing phase was all the more critical. (Id. at 210–11.) Thus, the absence of a sentencing strategy adversely affected the voir dire.

Lastly, Valdez asserts that Lewis's closing argument at the sentencing phase was deficient. In less than nine pages of trial transcript, counsel gave a vague and abstract discourse on the definitions of words in the special jury questions, (Trial Trans. Vol. XIII at 122–23), the greater destiny of civilization, (id. at 123–25, 130), the non-deterrent effects of war, (id. at 125), and his appreciation for Officer Bock, (id. at 126). Finally, almost as an afterthought, counsel got around to discussing whether Valdez "will" or "won't . . . commit anything else." (Id. at 127–29.) Counsel failed to make a clear and compelling case for why the mitigating factors outweighed the aggravating factors, and thus why the jury should not apply the death penalty. This resulted in an ineffective closing argument.

In sum, the defense attorneys spent a combined total of just 59 hours preparing

---

**35.** Also, the jury received the four "normal" I.Q. scores as part of Valdez's "pen pack." No effort was made by defense counsel to impeach these scores; in fact, neither Lewis or Gutierrez knew how these scores were obtained. (Evid. Hrg. Trans. Vol. I, at 152; id. Vol. III, at 160–61.) At the 1999 hearing, expert testimony supported the assumption

that Texas Department of Corrections probably arrived at those scores by administering the Beta II test. (Id. Vol. II, at 23–26.) The Beta II test, which is administered in fifteen minutes in a group setting, is universally held to be much inferior to the Wechsler exam, such as those taken by Valdez as an adolescent. (Id. Vol. II, at 28–36, 109–12.)

for all aspects of the case. Before trial, they spent a total of about 45 minutes talking with Valdez's family, and about 11 hours visiting Valdez. They failed to return calls from potential mitigation witnesses, and, when they did speak with Valdez and his family, they failed to ask pertinent questions. They failed to subpoena or order a single document in a search for mitigating evidence. They failed to pre-arrange for the testimony of a single mitigation witness. Their extemporaneous interviews of those persons onhand at the trial was so superficial that the attorneys failed to elicit any mitigation evidence about Valdez' background at the sentencing phase.

In light of the facts discussed above, the Court FINDS that defense counsel's performance in representing Valdez in the sentencing phase was deficient because it fell outside the wide range of professionally competent assistance, and because it did not meet an objective standard of reasonableness.[36]

### 2. Prejudice to Valdez

Valdez contends that, not only were his attorneys deficient, but that their deficient investigation and presentation resulted in prejudice to him at the sentencing phase. He asserts that, if the attorneys had made an adequate investigation, had presented at the sentencing phase the evidence found in that investigation, and had otherwise performed in a competent fashion throughout the trial, then he would have been sentenced to life rather than death. The State argues that there was no substantial prejudice to Valdez.

█ "Even if a defendant shows that particular errors of counsel were unreasonable, ... the defendant must show that they actually had an adverse effect on the defense." *Strickland*, 466 U.S. 668, 104 S.Ct. at 2067. The defendant must show

that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In particular, when a habeas petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. at 2069. In making this determination, the habeas court is to consider "the totality of the evidence before the judge or jury." *Id.*

Basically, the question for the Court is whether there is a reasonable probability that Valdez's jury, upon seeing the mitigating evidence that the attorneys should have gathered and presented, would have concluded that "the balance of the aggravating and mitigating circumstances did not warrant death." *Id.* For example, in *Loyd v. Whitley*, 977 F.2d 149 (5th Cir. 1992), *cert. denied*, 508 U.S. 911, 113 S.Ct. 2343, 124 L.Ed.2d 253 (1993), the defendant was convicted to death for having abducted, raped, and drowned a three-year-old girl. His attorneys failed to present to the jury evidence that the defendant suffered from a mental disease or defect. Given that it was the jury's role to evaluate the mental condition of the defendant and to consider it as a mitigating factor to the horrific crime committed, the Fifth Circuit found that the absence of the evidence of mental defect was prejudicial to the defendant and granted the writ. *Id.* at 160. More recently, in *Moore v. Johnson*, 185 F.3d 244, 261 (5th Cir.1999), defense counsel neglected to put on evidence of defendant's physical and emotional abuse as a child, his expulsion from the family

---

**36.** To the credit of the attorneys, they were both relatively inexperienced in 1987. Lewis acknowledged that he could have done a better job and that, if he had followed his current routine practice, he would have made the kind of investigation which the Court has now found reasonable in the circumstances.

home at age 14 (to contextualize his subsequent adoption of a life of crime), his school records showing developmental delays, and psychological tests establishing his mental impairment. *Id.* at 270–71. Based on this error, compounded by counsel's failure to present an earlier confession alleging mistake, to highlight defendant's early release from prison on another count, and to respond to misleading statements by the prosecutor as to defendant's conviction record, the Fifth Circuit granted the writ. *Id.* at 277–79. Similarly, in *Armstrong v. Dugger*, 833 F.2d 1430 (11th Cir.1987), defense counsel failed to present at sentencing evidence that defendant had been raised in poverty without adequate adult supervision and that he was mentally retarded; the court found that counsel's failure to present this evidence at sentencing caused sufficient prejudice to defendant to warrant the grant of the writ. *Id.* at 1433–34.

 Notwithstanding the brutal and senseless nature of the killing itself, the State's evidence of maliciousness and future dangerousness was weak compared to most capital cases. This tragic act of violence appears to have been conceived and completed within a matter of seconds, immediately following a high-speed car chase and a struggle with Bock. Few of the aggravating circumstances that would typically warrant a death sentence were present. (*See, e.g., Loyd, supra.*) Meanwhile, the omitted mitigation evidence was strong. The mental retardation evidence was significant by itself;[37] also, as applied to these particular circumstances, it would have tended to explain Valdez's panic during the incident and his alibi at trial. Further, the evidence of child abuse, gentle character, good prison behavior, and nonviolence as a criminal would have strongly fortified the case for mitigation. Finally, the inadequate questioning at voir dire and Lewis's closing argument both served to undermine Valdez's case at sentencing.

**37.** In 1988, at the time Valdez was sentenced, the Public Policy Resources Laboratory of Texas A & M University conducted a poll of Texas residents and determined that, while

Thus, the Court FINDS that there is a reasonable probability that the jury, upon seeing the balance of the aggravating and mitigating circumstances, would have refused to affirmatively answer the Texas special interrogatories which mandated the death penalty.

## V. CONCLUSION

For the foregoing reasons, the Court FINDS that Valdez's counsel rendered ineffective assistance to Valdez by failing to make a reasonable investigation into his background and that this failure resulted in substantial prejudice to Valdez at the sentencing phase of his trial. Accordingly, the Court FINDS that Valdez's Sixth Amendment right to effective assistance of counsel was violated with respect to the sentencing phase of his trial. The State is hereby ORDERED, within the next 90 days, either to: (1) conduct a new trial on the issue of sentencing only, as permitted by Tex.Code Crim.Proc. art. 44.29(c); or (2) vacate Petitioner's sentence and impose a sentence less than death.

86% were in favor of capital punishment, only 11% were in favor of allowing the execution of mentally retarded convicts. (State Habeas Hrg. Vol. II, at 343–44.)